The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, first case number 19-1954, Sonia Perez Vasquez versus Merrick Garland. Good afternoon, Your Honor. Jonathan Westreich on behalf of the appellants. Yeah, Mr. Westreich, it's good to have you with us, and Ms. Carter, it's good to have you with us. I'm sorry that we're not in Richmond, but it's the best we can do. And I'm glad to hear that the clerk has already put the new Attorney General into the case. Mr. Westreich, you may proceed. Thank you, Your Honor. For one housekeeping matter, preparing for today, I noticed a couple of typographical errors in my brief, including a case citation that was incorrect in the table of authorities. I'm always embarrassed to find such things, and I do apologize for any inconvenience caused by such errors. I'll get right to the meat of the matter. The standard of review, of course, to overturn a denial of asylum, if it's manifestly contrary to law, factual findings are reviewed under a reasonable adjudicator standard, whereas legal conclusions are reviewed de novo. For the Convention Against Torture, the standard of review for the finding of facts and substantial evidence to be overturned when a reasonable adjudicator would be compelled to a contrary conclusion. The appellant in this matter and her daughter fled Honduras, the United States in November of 2016, applied for political asylum and withholding of removal under the Convention Against Torture on July 26, 2017. In February of 2018, the Immigration Court denied relief and ordered removal, was timely appealed to the BIA, and then in August of 2019, the BIA dismissed the matter. A timely appeal was noted to this court. The appellant seek asylum and withholding of removal under Sections 208 and 241b-3 of the Immigration and Nationalization Act and protection under Article III of the Convention Against Torture. They seek to terminate removal because of defective notice under the Piera recession standard, although I will acknowledge that is the weaker of my arguments today. I'm not abandoning that argument, of course, but it is the weakest of the three. For asylum to qualify, the appellants have to demonstrate that she is unable or unwilling to return to her native country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, or membership in a particular social group or political opinion, and show a nexus between the protected status and the persecution. This court in Lagos-Bibar, which, as of the writing of my brief, was not formally reported. It is now reported at 927F3-236, addressed this matter with some detail, and Judge Harris, who I believe is on the panel or is scheduled to be on the panel, was on the panel for the Lagos matter. Regarding unable or unwilling to return to her native country because of a well-founded fear, threats of death have long been held on this circuit to qualify for persecution, the Zavaleta-Palosano matter, as well as Hernandez-Avalos. An extortion can be sufficient even if you're only harmed if you don't pay. Again, the Zavaleta-Palosano matter. And past persecution is sufficient to establish a well-founded fear of future persecution. In the matter before the court, the appellant and her daughter were threatened with death if they don't pay. In addition, further threats were directed to the minor daughter of the appellant. After the matter was reported to the police, further threats... How old is his daughter? I apologize, Your Honor, I don't know that off the top of my head. I know she was a minor at the time. I apologize, I don't have that date in front of me. That's fine. Were these unconditional threats of death? What were the... The threats were, if you don't pay us, we will kill your daughter and kill you. How many times? There were multiple occasions of this. So she paid several times and then stopped paying. So just like in the Lagos matter, there were a pattern of threats, if you don't pay, we will kill you, followed by her fleeing the country. And the Lagos matter involved Honduras just as the matter before the court. The appellant also testified that there was nowhere she felt safe in Honduras. Counsel, this is Judge Harris. I wonder if I could take you to sort of where the agency disagreed with you, because the agency didn't say, at least, that they didn't think this threat counted as persecution. They said there's no nexus between the claim particular social group of the nuclear family and the threats here. So do you want to address that? So the nexus, you're right, that is the focus of the disagreement. But there's also the political element of it. So in Lagos, the decision to failure to pay is a political act, not simply a refusal to pay a debt. So the nexus is the political act of, I'm not going to pay the debt. If you don't pay us, we're going to kill you. That's the nexus. So let me ask you, Counsel, you bring up the Lagos case. Is that the case that is most applicable here from the Fourth Circuit? It certainly is. Addressing the nexus between a membership in a nuclear family and the persecution she supposedly suffered? It may not be the most current one, but I believe it's the most on point with the facts here. So just as in Lagos. I guess I'm thinking of the Hernandez-Cartagena case. I apologize, Your Honor, that case is not coming to memory. But I focused on Lagos. I'm sorry? Go ahead. Continue. I focused on Lagos because the similarities in the facts were so very much, were so close. Now, there is one difference in Lagos, of course, is that she had the additional element of being a single parent, which is not present in the matter here. But the facts in Lagos, the failure to pay, followed by additional threats, I think was very important. In addition, in this case, the appellant contacted the police, followed by further threats from the extortionists. So I think that is the nexus. Threats to kidnap and kill the daughter, just as was in Lagos. But I'm sorry, the nexus to what, right? You have to show that the threats were connected to her relationship with her husband, who's sending the money, right? Yes. Okay, so let me just ask you. I understood the agency to be suggesting that maybe there was no evidence of any causal link there because, you know, he'd been doing it for 11 years before they first threatened her and things like that. So maybe it was just a coincidence. What's your response to that? What's the best record evidence that there's a causal link here? The record, the evidence is that the threats escalated. I think what may well have happened, I think the record would support this, is the extortion increased when they realized they could get the claws into the appellant through her daughter because of her connection to the husband, who was here in states. So it was targeted to her based on the husband being here. And what do we do, did your client say at the hearing, this is something the agency talked about a lot, did your client say at the hearing that she didn't know why she was being targeted? And if so, how do we handle, how would you handle that? She did say she did not know. And the answer is, she doesn't, how could you possibly know the intent of another unless, of course, if they had come and said, we are targeting you because we don't like people of your ethnicity, that would be direct. But where do we ever have that? Well, I thought they kind of did come to her and say, we're targeting you because we know you get money from your husband in America. Yes, they did. Okay. But in addition, she has the refusal to pay, which is the political act. And after asserting that political opinion, I'm not going to pay you, further threats. And so the nexus there between the threats and her political opinion is there. Did I answer your question, Your Honor? Did you raise this political opinion issue before the agency because it didn't seem like you did? But if you can tell me where you raised it. Trial counsel asserted the convention against torture and asserted the argument that she was, the facts. So the facts of the threats, the reports to the police and the subsequent threats, those are the facts that underline the political act of that I'm talking about here. I do not believe that it was expressly asserted as a political act in the lower court, but the facts that underline the assertion were presented. I think that's sufficient to give this court jurisdiction. I believe my distinguished counsel for the government may disagree with me on that point, but that is certainly my position. And also, I have to get them. You normally have to give them a fair shot at it to preserve it, right? Yes, you're right. And you're going to be able to talk here. Did you know that the did you that you heard that the four circuits jurisprudence on these death threats in immigration cases is, according to the government, all messed up? Your Honor, the clerk asked me to point out my 15 minutes has expired. I was directed to advise you when I noticed that. Okay, well, I want to see if you can answer that question first. I apologize, Your Honor. The question was, am I aware that the government doesn't like your rulings on threats? They say it's all messed up. We ought to get it straightened out. I was not aware of that. We revised that in an in-bank case a few days ago. Unless you listen to that, you might not know about it. I did not listen to that. I'm not aware of it. And it's I'm not. Again, I'm not sure how the government's argument would be that I would never say to the Court of Appeals or frankly, any court that they were messed up on anything, Your Honor. Well, I think that the messed up part is my language. I don't know. Yes, Your Honor. I'm not going to say that to the government lawyer, but that's the gist of it. But you don't know about it. That's fine. I'm sort of setting up, I guess, for the government lawyer to be sure about it. Yeah, I am. But as I look at the government's arguments, for a moment or two, on that issue, on it seems a thread going through some of the arguments of if you let this satisfy the requirements, then they'll open up the floodgates. And I don't think that's an appropriate basis to make a ruling. I think that we need to look at and I think the case, the law in this circuit is we have to look at each one individually. And I think that particularly with the framework from Lagos, I think we satisfy the requirement. My time has expired and I will stop talking now. Thank you, Your Honor. Well, before you leave, when you go back to your seat, I don't know what kind of technology you've got. Yes, Your Honor. You're relying on this Lagos case and you do have a serious waiver problem, I think, on the political opinion aspect of it. But the nexus issue that's in this case is squarely addressed in the Hernandez-Cartagena case, which was last year. Lagos was the year before. And I'm sort of miffed that you don't know about that case. I apologize, Your Honor. From my perspective, it seems to be more to what we are dealing with here in trying to determine if there's a person, a nexus, and it dealt with the economic incentive in that case, too. So I implore you, you might want to take a quick look at that. I'm not sure I'll be able to find it in time to address it this morning, Your Honor. I'm not sure your argument went on something that looks like to me it's waived on the political opinion. Yes, Your Honor. All right.  Ms. Carter? Yes, Your Honor. You there? Yes, I'm here. Can you hear me? Yes, I can now. Good to have you with us. Thank you. Thank you. Good afternoon, and may it please the Court. Margo Carter for the United States Attorney General, Merrick Garland. I hope you're all staying. You may be the first lawyer in the country to represent Attorney General Garland. You know that? Oh, wow, that's exciting. Well, he just got sworn in a couple of hours ago, didn't he? Yeah, yes, absolutely. Go right ahead. Sure thing. The Court should deny the petition for review. In this particular case, there is nothing particular about the petitioner's family here that led the gang members to target the petitioner. The petitioner's husband did give her money, and the gang members knew about it, and the gang members wanted that money. But at the end of the day, this comes down to the substantial evidence standard. And the record doesn't compel the conclusion that the reason why the gang members targeted the petitioner in this case was on account of her marital relationship. So I will ask you, are you familiar with the Hernandez-Cartagena case from this circuit? Yes, Your Honor, I am. I'm happy to hear that. And so why is that case not similar to what we are dealing with here? In that case, it was an issue in which the immigration judge had focused the court found narrowly just on the gang's reasoning for targeting the family rather than on its reasons for targeting the petitioner herself and not some other person. And there seems to be a lot of connectivity between that case and this case. How do you view that case in terms of its influence on this one? Well, thank you, Your Honor. I think that Your Honor is right to observe that there is some overlap between the two cases. On the other hand, this case is distinguishable because in Hernandez-Cartagena, the immigration judge had failed to address unrebutted evidence that compelled the conclusion that family was at least a central reason why the petitioner was targeted in that case. And in the present case, the evidence simply doesn't compel that conclusion. Well, let's go straight to where this Hernandez case is going. The court there dealt with an issue in which the gang had been saying that the gang was motivated by monetary gain and therefore her ability to pay us, so to speak. But the court went on to say it is enough that the protected ground be at least one of the central reasons for the persecution. And here she's alleged this nuclear family and this money that she's receiving from her husband, and it's because she's part of this family is the reason, the connection between the persecution and the gang that's going on here. I think that in the current case that we're looking at right now, our case can be distinguished here because in the Perez-Vazquez case, the petitioner testified that the targeting by gang members of people was widespread. That there was not something about her family in particular that led the gang members to single her out. And moreover, that conclusion that was reached by the agency. She was receiving money every month from her husband, and they knew she was going to that bank and getting the money and coming back with it. And the standard here is a substantial evidence standard. So there's a legal error by the immigration judge if he applies the one central reason standard incorrectly. That is correct. If the immigration judge had applied that standard incorrectly, that would be a legal error. On the other hand, in this case, the immigration judge considered the evidence. And he found that but for petitioner's husband being in the U.S. and sending money back, she would not likely have been targeted or threatened. He found that. So if that was a but for reason for her persecution, doesn't that by definition satisfy the one central reason standard? Well, I think at bottom, the court needs to examine the motive of the persecutors under Elias Zacharias. And where the motive of the persecutors is grounded in their desire to enrich themselves and not grounded in any particular animus toward her family. I mean, I think the fact that... Counsel, this is Judge Harris. I feel like we have rejected that particular proposition just over and over again. That there doesn't need to be animus against the family as a family. It's just the family relationship has to explain why of all the people they could have targeted out of greed and in order to enrich themselves, they picked this person. And I just I guess I have basically the same question as Judge Wynn. So maybe it's not helpful to ask it again. But under the standard as we have laid it out so many times now, once the IJ says, yeah, like but for the relationship with her husband, this would not have happened. I am sort of struggling with how that doesn't dispose of the case on nexus grounds. I mean, there's lots of other stuff. Right, right, right. And and we can move to the unexhausted Convention Against Torture claim. And the court held challenge of the court is interested in those two issues. But we can we can focus on on this nexus issue. I think that, again, it comes down to the fact that. The petitioner was chosen because she has money doesn't necessarily mean she was chosen because of her marital relationship, that money could have come. But it doesn't have to be because because the agent we've told the agency time and time again that there can be multiple intertwined motives. That that is definitely possible that there can be more than one motive, but at bottom, when the petitioner herself has said that she was unsure why her family was chosen and when other people who were not her family were also targeted. And in addition, there's evidence that members of her family besides her were not targeted. It was a reasonable conclusion for the immigration judge and the board to look at that evidence and conclude that there wasn't a motive on the part of the gang members to target her on the basis of her family membership. Would it make a difference, counsel? I mean, one thing that we talked about in Hernandez, Cartagena and some other cases is that, you know, the fact that the money is coming from a relative allows the gang to sort of leverage that relationship. It's a sure stream of income. If it's coming from someone who will be very sad if the gang kills this woman and her his and her daughter. So it's it's there's a reason why the family relationship would factor it, you know, would kind of intertwine with the with the financial desires in a case like this, because you can leverage the family relationship to keep the money coming. I mean, I think that it's possible that the. That that may be the case. I don't know that in this particular case, there's evidence that the gang members were motivated by her family in that way. Why did they tell her like the very the IJ credit says when they come to her, they say out loud what your colleague said is so unusual that someone will actually say exactly what's on their mind in the middle of an extortion threat. But they say, like, we're here because we know about your husband and we know he's sending you money. I mean, doesn't that sort of indicate that this is part of the motive in this case? Why else mention it just like a pleasantry? Well, I think that the that, again, it comes down to the substantial evidence standard and whether or not the record compels the conclusion that family was the motivating factor or was a motivating factor for the gang members when if she had been getting that money from a charity or a trust account or an employer, the gang members arguably would have been just as motivated to target her. But the fact is, she got the money from her husband and they knew it. It the the record makes clear that they were aware of the payments that were being made by her husband to her. Yes, that is that is an accurate statement. She testified to that and the IJ said she's credible. We believe that is that is correct. That is correct. Do you acknowledge that finding? Go ahead, judge. I'm sorry. No, you go ahead, judge. No, I just wanted to I'm just trying to understand it because I made that finding. But for finding that petition's husband being in the U.S. and sending money back, she would not likely have been targeted or threatened. But for that. And so I think that that seems to satisfy the one central reason standard. And I mean, I think our our response would just be that that, again, the the record supports the conclusion that the agency reached, which is that the marital relationship wasn't the basis for the gang members interest in her. The steady stream of money was the basis and the marital relationship was incidental to that. And that might have been understandable before Hernandez, but you have the Hernandez case, which is seem to say the opposite. Do you acknowledge that as well, that that these were death threats to against the petitioner and her daughter? I think the record makes clear that that the petitioner and her daughter were threatened, yes. With death? Yes, I think that is. And are you familiar with the fact that one of your colleagues in bank proceeding a few days ago before this court advised us that our death threat jurisprudence was. Out of control or something and ought to be straightened out. I am I am not aware, I know that there was an on bar on bank decision hearing earlier this week was that Portillo Flores, maybe. That's right. In bank proceeding on Monday. And our death, our death threat court jurisprudence was criticized by the by the attorney general's representative. OK, I think. I think you're not challenging our death threat, of course, jurisprudence. I mean, I think in this particular case, the the board's decision here turns on the issue of nexus and and not whether or not the threats rose to the level of persecution. I think when the board said and this is on page five of the record, I think when the board said that economic extortion is not a recognized form of persecution. What they were referring to is that. If it were economic extortion purely and there were no protected ground implicated, then that would be insufficient to qualify as persecution. But apart from that, I don't I don't think this case turns on a on an insufficient past persecution finding. I think that the board assumed without deciding that the social group was cognizable and then turned to the issue of whether or not there was a nexus in this case. Counsel, I read the opinion the same way, but can I just ask you in terms of the threat? So just assuming hypothetically that I thought there was a nexus established on this record. So normally we would just remand to the agency and let the agency, as you say, I didn't see that the agency has already addressed this question of whether the harm at issue rises to the level of persecution. And normally we would just remand on that. But I am trying to get a feel for if we do that. Are we going to be back here again with the agency coming back to the Fourth Circuit and saying we understand that under your jurisprudence, this would constitute persecution, these death threats. But we think that's all wrong and that you should reverse all of your cases. Should we go ahead? I mean, I think I think it's a I think it's a very sort of hypothetical chain of events. I mean, I can see I can see lots of different possible outcomes to this case if the court were to to seek to remand it. And it's it's hard to know whether the petitioner might introduce additional facts, whether the board might further remand to the immigration judge. It's hard, hard to know what arguments would be made down the road on that. And I'm not familiar with what arguments were made in the in the en banc hearing regarding past persecution. If I can turn to the Convention Against Torture claim, that would just reiterate that that claim was unexhausted as it was not raised properly before the board. And further, with respect to the petitioner's challenge to the sufficiency of the notice to appear, that is foreclosed by this court's decision in June. And so that's why it's not in the United States versus Cortez. And as for the logos issue that the petitioner raised regarding the anti-gang political opinion, we addressed that in our brief on page twenty three. But essentially, this anti-gang political opinion claim was not one that was raised during petitioner's immigration court proceedings or in her appeal to the board. And we we would respectfully argue a waiver on that point. If the court has nothing further, we would respectfully ask that the court deny the petition for review and dismiss it to the extent that the petitioner has raised some unexhausted issues. Thank you, Ms. Carter, very much. Thank you, Mr. Westrick. Yes, your honor. I believe I reserved a five minutes, although I think I may have used some of that initially as my colleague. Thank you, your honor. And my colleague pointed out the board did on page five of the record. So economic distortion is not a recognized form of persecution, which I think is not the law in this circuit. And I did use the time to pull the Hernandez Cartagena matter. And on page ten of that ruling, the court wrote that the petitioner in that case demonstrated that her family was being targeted for extortive threats. Similarly here, it is the family that's being targeted. And I think that the combination of the Hernandez Cartagena matter and the Lagos matter is the law that really should control here. While I'm not conceding the Pereira argument, I think that is my weaker argument. And I believe on the Convention Against Torture issue that the facts were raised below. And the Convention Against Torture was noted in the brief that counsel presented to the board. But I think unless the court has other questions, I have nothing further to add beyond that. Very good. We appreciate it. Your case will be submitted. If we were in Richmond, we'd of course leave the bench and come down and shake hands with you. You did a good job as well. We'll do the same thing with Ms. Carter. But we have to defer that to your next appearance, hopefully in Richmond. Thank you very much. Thank you, and I appreciate the courtesy of you and your staff in organizing the remote appearance. Your staff has been very, very helpful. Thanks again.
judges: Robert B. King, James A. Wynn Jr., Pamela A. Harris